UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

FRANK VITA,
     Plaintiff,

v.                              Case No. 8:23-cv-2635-KKM-AEP

JOSEPH TOURNAI and
MARK KNOTTS,
     Defendants.

_____

## ORDER

Defendants Joseph Tournai and Mark Knotts move for summary judgment on Plaintiff Frank Vita's claims for excessive force and failure to intervene. (Doc. 44.) Upon consideration, the Defendants' motion is granted.

## I.   INTRODUCTION

### A. Procedural History

Vita sues Tournai and Knotts, two Pinellas County Sheriff's Office deputies, under 42 U.S.C. § 1983. (Doc. 1.) He brings a claim for excessive force against Tournai and a claim for failure to intervene against Knotts. Vita's claims arise from his booking into the Pinellas County Jail in the early morning hours of July 14, 2020, following his arrest for driving under the influence.

1

## B. Plaintiff's Motion to Strike the Defendants' Statement of Facts

The Defendants filed a Statement of Undisputed Material Facts (Statement) with their motion for summary judgment. (Doc. 43.) The Statement provides that Plaintiff accepted certain paragraphs as undisputed but opposed the inclusion of the remaining paragraphs in the Statement. (*Id.*, p. 1.)

Plaintiff moves to strike the Statement for failure to comply with the Case Management and Scheduling Order. (Doc. 47.) The Case Management and Scheduling Order states that the moving party must file a separate Joint Statement of Undisputed Facts "agreed upon by all parties." (Doc. 31, ¶ 9(b).)

Upon consideration, Plaintiff's motion to strike, (Doc. 47), is granted-in-part to the extent that the portions of the Statement that Plaintiff opposes are stricken from the Statement. Under the Case Management and Scheduling Order, these factual representations should not have been included in a Joint Statement of Undisputed Facts. Plaintiff's motion to strike, (Doc. 47), is denied-in-part to the extent the Court accepts paragraphs 1 through 9 and paragraphs 11 through 13 of the Statement, which Plaintiff agrees contain undisputed facts.

## II.    FACTUAL BACKGROUND

### A. Undisputed Facts

When Vita arrived at the Pinellas County Jail, he refused to give his name and date of birth to a booking deputy who asked him for this information. (Doc. 43, ¶¶ 2-3.) A second deputy at the booking desk asked Vita to identify himself, but Vita refused. (*Id.*, ¶ 4.) Vita stated that it was his "Fifth Amendment right" not to identify himself and that it was "redundant" to ask for this information because police had his wallet and identification. (*Id.*)

Vita was then taken to the processing area to be photographed and fingerprinted. (*Id.*, ¶ 5.) When asked for his identifying information at the photo station, Vita refused to provide his name and date of birth to the photo technician. (*Id.*, ¶¶ 6-7.) Next, Vita was taken to the fingerprint station, where the fingerprint technician asked for his name and date of birth. (*Id.*, ¶ 8.) Vita did not provide the information. (*Id.*, ¶ 9.) He asked, "You know, why is it that at every point in the booking I have to give the same information? Aren't these computers synced in?" (*Id.*)

The fingerprint technician told Vita to wait outside the fingerprinting room and summoned Tournai for assistance. (*Id.*, ¶ 11.) Tournai and Vita had the following conversation:

| | |
|---|---|
| Tournai: | Will you give them your birth date? |
| Vita: | Huh? |
| Tournai: | Will you give them your birth date? |
| Vita: | I gave them my birthday. [Gesturing to video booking] |
| Tournai: | No, no, no, no, will you give them your birth date right here, in this room? |
| Vita: | They already took it. [Gesturing again to video booking] |
| Tournai: | I know, but you've got to do it again, bro. Can you do it? |
| Vita: | No. I'm a retired cop. |
| Tournai: | Dude, do not give me a hard time. |
| Vita: | I'm not. |
| Tournai: | Are you—Are you going to tell her your birthdate? Don't make it complicated. You're not going to do it? |
| Vita: | What's the big deal? |

(*Id.*, ¶ 12.)

Knotts approached Vita and Tournai as they had this conversation. (*Id.*, ¶ 13.)

4

## B. Disputed Facts

After Knotts reached Vita and Tournai, the interaction became physical for about 20 seconds until Tournai tasered Vita. The parties disagree about how the events during this time unfolded. Cameras in the jail captured the incident.

### 1. Vita's Version of Events

Vita testified that as he talked with Tournai outside the fingerprint room, Tournai raised his voice and "got obviously very agitated because [Vita] wasn't cooperating with him." (Doc. 43-4, p. 42.) Vita alleges that as Knotts approached, Tournai was breathing heavily "as if he was preparing for an altercation." (Doc. 1, ¶ 13; Doc. 49, p. 3.) Vita alleges that Tournai grabbed his left arm and purposely pushed it "up and away to falsely make it appear" that Vita was physically resisting Tournai, thereby providing Tournai "with an excuse to then use force against Vita." (Doc. 1, ¶14; Doc. 49, p. 3.)

Vita alleges that Tournai and Knotts slammed him against a concrete wall outside the fingerprint room and that he slid or "melt[ed] down" into one of the chairs lined up along the wall. (Doc. 1, ¶ 15; Doc. 43-4, pp. 45-46; Doc. 49, p. 3.) Vita alleges that, because he was not resisting, his head "hit the concrete wall with substantial force." (Doc. 1, ¶ 15.)

Vita alleges that while he was in the chair, Tournai controlled his left arm and Knotts controlled his right arm. (Doc. 1, ¶ 16.) Vita testified that they "start[ed] in on [him] at that point" and attacked him. (Doc. 43-4, p. 46.) Vita alleges that he "remained calm at all times and offered no physical resistance as he acknowledged and complied with the Deputies' commands." (Doc. 1, ¶ 16.) Vita alleges that he told Tournai to "relax" and "take it easy." (Doc. 49, p. 5.)

Vita alleges that Tournai unholstered his taser and aimed it at Vita as he screamed, "Give me your arm. Give me your arm." (Doc. 1, ¶ 16; Doc. 43-4, p. 47.) Vita testified that he was not resisting, but that Tournai was "totally raging at that point." (Doc. 43-4, pp. 47, 49.) Vita alleges that Tournai and Knotts stood him up from the chair as he "acknowledged the Deputies' commands and offered no physical resistance." (Doc. 1, ¶ 17.) Vita alleges that the Defendants commanded him to get on the ground, but that the Defendants began pulling his arms in opposite directions. (Doc. 1, ¶ 18; Doc. 49, p. 5.) Vita alleges that he remained calm and responded, "OK." (Doc. 1, ¶ 18.)

Vita testified that Knotts "took his foot and buckled [Vita's] right knee" and that Vita "was on [his] way down to the ground . . . because Knotts had buckled [his] knee." (Doc. 43-4, pp. 50-51.) Vita alleges that as he began "falling to his knees,"

Tournai tasered him "in the back at point blank range while yelling 'get on the fucking ground.'" (Doc. 1, ¶ 19, Doc. 49, p. 5.) Vita alleges that he fell onto his face, with the Defendants on top of him. (Doc. 1, ¶ 19.)

## 2. The Defendants' Version of Events

The Defendants allege that when Knotts came over to Vita and Tournai, Tournai told Vita, "Come on," and attempted to take hold of his left arm. (Doc. 44, pp. 6-7.) But, they allege, Vita "pulled and twisted away and a struggle to get Vita secured in restraints ensued." (*Id.*) The Defendants also allege that Vita was "repeatedly commanded to surrender his arms and hand for handcuffing and [did] not." (*Id.*, p. 11.) The Defendants allege that they "struggled with Vita for more than twenty seconds before Deputy Tournai tasered him." (*Id.*, p. 12.) They allege that during this struggle, they "told Vita twice to give them his arms, told him twice to put his hands behind his back, and told him twice to get on the ground," but that "Vita did not do any of these things." (*Id.*) The Defendants allege that "[i]t was only after Vita refused six times to submit to being handcuffed that Deputy Tournai tasered him." (*Id.*, pp. 12-13.)

Although Tournai testified to a limited independent recollection of the incident, he testified that this was the "type[] of scenario . . . when you would

definitely want to use the taser. When you - - when you can't physically get control of somebody, you have to do something different." (Doc. 43-3, p. 40.) He testified that "[i]f you don't, you can end up getting hurt, killed or somebody else in the room can get hurt or killed also." (*Id.*) He also testified that he was in fear that Vita would strike him because "[a]nytime an inmate isn't compliant, [he's] afraid that anything could happen in that situation." (*Id.*, p. 44.) Knotts similarly testified that he did "not really" have an independent recollection of the event, but that he "vaguely" recalled feeling Vita bracing by pinning his arm against his body while seated in the chair and when he stood up. (Doc. 43-2, pp. 18, 21-22.) Knotts recalled that Tournai unholstered his taser while Vita was seated and remembered Tournai dropping the taser. (*Id.*, pp. 22-23.)

### C. Videos from the Pinellas County Jail

Video footage shows Vita entering a room off the lobby to be fingerprinted. (Video 092, 3:33-3:37; Video 130, 0:05-0:10.)[1] Vita was not handcuffed or otherwise restrained. (*Id.*) Two technicians were in the room. (Video 130, 0:05-0:10.) Vita, with his back to a camera inside the room, stood near one of the technicians and gestured

---

[1] Each video is labeled with the date July 14, 2020, followed by a nine-digit number. The Court refers to the videos by the last three digits. Of particular note, videos 092 and 130 are the most relevant.

with his hands. (Video 130, 0:07-0:25.) The second technician stood up and walked a short distance outside the doorway, where she waved her hand in the air before coming back into the room. (Video 092, 3:49-3:53; Video 130, 0:14-0:23.) The first technician directed Vita out of the room and toward a row of chairs against the lobby wall. (Video 130, 0:24-0:35.) Tournai walked briskly from the other side of the lobby to the fingerprint room. (Video 092, 3:54-4:05.) He arrived as the first technician stood with Vita near the doorway. (Video 130, 0:31-0:35.)

Standing near one another in the lobby directly outside the fingerprint room, Vita and Tournai had the conversation quoted above. (Video 092, 4:05-4:34; Video 130, 0:35-1:04.) As addressed, Tournai asked Vita several times if he was going to provide his identifying information and told Vita that he needed to do so. As they talked, Knotts approached from another area of the lobby. (Video 092, 4:28-4:34; Video 130, 0:52-1:04.)

After Vita responded to one of Tournai's requests by saying, "What's the big deal?" Tournai said, "All right, come on, come on," and placed his right hand on Vita's left arm, near the elbow. (Video 092, 4:34-4:35; Video 130, 1:03-1:04.) Vita's left arm rose into the air. (Video 092, 4:35; Video 130-1:04-1:05.)

Tournai was on Vita's left side and Knotts was on Vita's right side. Tournai and Knotts pushed Vita toward the chairs and wall outside the fingerprint room, and Vita came to a seated position in a chair. (Video 092, 4:36-4:38; Video 130, 1:05-1:07) One of them told Vita two times, "Bring your arm down," and Vita said, "Okay," and "Easy." (Video 092, 4:40-4:43.) One of the Defendants twice told Vita to put his hand behind his back. (Video 092, 4:45-4:48.) The Defendants both stood with a wide stance, making physical contact with Vita and attempting to gain control of his arms. (Video 092, 4:36-4:51; Video 130, 1:05-1:20.) Tournai unholstered his taser, which fell to the ground, and retrieved it. (Video 092, 4:48-4:50; Video 130, 1:16-1:20.)

Tournai and Knotts pulled Vita up on his feet. (Video 092, 4:51-4:53; Video 130, 1:20.) Tournai held Vita's left side and Knotts held Vita's right side. (*Id.*) One of the Defendants directed Vita to get on the ground. (Video 092, 4:51-4:52.) Vita, who was situated between but in front of the Defendants, took three steps away from the row of chairs. (Video 092, 4:51-4:54; 130, 1:20-1:24.) Vita was again directed to get on the ground. (Video 092, 4:52-4:53.) As Knotts tried to pull Vita's right side toward the ground, Vita said, "Okay, easy." (Video 092, 4:53-4:55.) Tournai tasered Vita in the back and Vita fell to the ground. (092, 4:56; 130, 1:25.) The Defendants restrained Vita, and other jail personnel came over to them. (Video 092, 4:57-6:40.)

10

## III.   LEGAL PRINCIPLES

### A. Liability Under Section 1983

"[S]ection 1983 provides a method for vindicating federal rights conferred by the Constitution and federal statutes." *Bannum, Inc. v. City of Fort Lauderdale*, 901 F.2d 989, 997 (11th Cir. 1990). To successfully plead a § 1983 claim, a plaintiff must allege: "(1) that the act or omission deprived plaintiff of a right, privilege or immunity secured by the Constitution or laws of the United States, and (2) that the act or omission was done by a person acting under color of law." *Id.*; *see also Knight v. Jacobson*, 300 F.3d 1272, 1276 (11th Cir. 2002) ("Section 1983 does not create a remedy for every wrong committed under the color of state law, but only for those that deprive a plaintiff of a federal right.").

### B. Summary Judgment

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of stating the basis for its motion and identifying those portions of the record demonstrating the absence of genuine

issues of material fact. *See Celotex,* 477 U.S. at 323; *Hickson Corp. v. N. Crossarm Co.,* 357 F.3d 1256, 1259–60 (11th Cir. 2004). That burden can be discharged if the moving party can show the court that there is "an absence of evidence to support the nonmoving party's case." *Celotex,* 477 U.S. at 325.

When the moving party has discharged its burden, the nonmoving party must then designate specific facts showing that there is a genuine issue of material fact. *Id.* at 324. The nonmoving party must "go beyond the pleadings" and point to evidence of a real issue for trial. *Id.* (quotation omitted). "A mere 'scintilla' of evidence" does not suffice; "there must be enough of a showing that the jury could reasonably find for [the nonmovant]." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (quotation omitted).

The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). Issues of fact are "genuine" only if a reasonable jury, considering the evidence presented, could find for the nonmoving party, and a fact is "material" if it may affect the outcome of the suit under governing law. *Id.* at 248–49. In determining whether a genuine issue of material fact exists, the

court must consider all the evidence in the light most favorable to the nonmoving party. *Celotex*, 477 U.S. at 323. But a party cannot defeat summary judgment by relying on conclusory allegations. *Holifield v. Reno,* 115 F.3d 1555, 1564 n.6 (11th Cir. 1997).

Additionally, a court will not accept the non-moving party's "version of the facts when obviously contradicted by the record," including "a video of the entire event." *McCroden v. Cnty. of Volusia*, 724 F. App'x 768, 771 (11th Cir. 2018). A court should "view[] the facts in the light depicted by the videotape." *Scott v. Harris*, 550 U.S. 372, 380-81 (2007); *see also Penley v. Eslinger*, 605 F.3d 843, 848 (11th Cir. 2010) (stating that a court determining the relevant facts at summary judgment should draw all inferences in favor of the nonmovant only "*to the extent supportable by the record*" (emphasis added) (quotation omitted)).

A court may disregard the non-moving party's version of events if a recording "completely and clearly" contradicts it. *Brooks v. Miller*, 78 F.4th 1267, 1278 (11th Cir. 2023). But if the recording "renders a party's story merely unlikely yet does not necessarily contradict it, the default rule kicks in: [a court] must accept the party's version for purposes of considering the motion for summary judgment." *Id.*

"The district court need not sua sponte review all of the evidentiary materials on file at the time the motion is granted, but must ensure that the motion itself is supported by evidentiary materials. At the least, the district court must review all evidentiary materials submitted in support of the motion for summary judgment." *United States v. One Piece of Real Prop. Located at 5800 SW 74th Ave., Miami, Fla.*, 363 F.3d 1099, 1101–02 (11th Cir. 2004) (citing *Jaroma v. Massey*, 873 F.2d 17, 20 (1st Cir. 1989) (per curiam)). If the evidentiary materials submitted in support of the motion for summary judgment raise a genuine issue of material fact, summary judgment cannot be granted.

### C. Qualified Immunity

The Defendants argue that they are entitled to qualified immunity, which protects a government official acting within his discretionary authority from civil lawsuits unless his conduct violates a statutory or constitutional right clearly established when the alleged violation occurred. *Gilmore v. Hodges*, 738 F.3d 266, 272 (11th Cir. 2013). "The purpose of this immunity is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir.

2002) (internal quotation marks and citation omitted). Thus, qualified immunity "offers complete protection for government officials sued in their individual capacities if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

For qualified immunity to apply, a defendant must show that he was "acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Spencer v. Benison*, 5 F.4th 1222, 1230 (11th Cir. 2021). Once that showing is made, "the burden shifts to the plaintiff to show that the official's conduct (1) violated federal law (2) that was clearly established at the relevant time." *Id.* A court may consider these two factors in either order. *Id.*

## IV.  ANALYSIS

### A. Excessive Force

#### 1. Introduction

Vita sues Tournai for excessive force. The Due Process Clause of the Fourteenth Amendment governs this claim. *Cottrell v. Caldwell*, 85 F.3d 1480, 1490 (11th Cir. 1996). "To establish a claim for excessive force in the Fourteenth Amendment context, 'a pretrial detainee must show only that the force purposely or knowingly used against

him was objectively unreasonable.'" *Ireland v. Prummell*, 53 F.4th 1274, 1297 (11th Cir. 2022) (quoting *Kingsley v. Hendrickson*, 576 U.S. 389, 396-97 (2015)).

Considerations bearing on whether the force was reasonable include, but are not limited to, "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Kingsley*, 576 U.S. at 397.

A court "must also account for the 'legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained,' appropriately deferring to 'policies and practices that in th[e] judgment' of jail officials 'are needed to preserve internal order and discipline and maintain institutional security.'" *Id.* (quoting *Bell v. Wolfish*, 441 U.S. 520, 540 (1979)).

### 2. Analysis

Tournai asserts the defense of qualified immunity. He argues that he did not use unconstitutionally excessive force on Vita and that, even if he did, any federal law he violated was not "clearly established." Because he was acting in the scope of his

discretionary authority as a deputy when he used force, Tournai has made the first showing of the qualified immunity analysis. *See Spencer*, 5 F.4th at 1230.

The Court next assesses whether, taking the facts in the light most favorable to Vita to the extent that they are not contradicted by the videos, Vita has shown that Tournai violated federal law by using objectively unreasonable force. *See id.* When considering the reasonableness of a particular use of force, a court must take the perspective of "a reasonable officer on the scene," and must "embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham v. Connor*, 490 U.S. 386, 388, 396–97 (1989). Moreover, because "reasonableness" is an objective test, the Court does not consider an individual officer's intent or motivation. *Id.* at 397.[2]

---

[2] *Graham* involves a claim for excessive force under the Fourth Amendment, not the Fourteenth Amendment. *Graham* and other Fourth Amendment cases are relevant. The Supreme Court clarified in *Kingsley* that the excessive force inquiries under the Fourth and Fourteenth Amendments both ask whether the use of force was "objectively unreasonable." *See Piazza v. Jefferson Cnty., Ala.*, 923 F.3d 947, 952-53 (11th Cir. 2019) (stating that, following *Kingsley*, "the Fourteenth Amendment standard has come to resemble the test that governs excessive-force claims brought by arrestees under the Fourth Amendment").

### a. The Force was not Objectively Unreasonable

The force used against Vita was not objectively unreasonable and thus was not excessive in violation of federal law. In analyzing whether the force was reasonable, the Court considers together the first and third factors listed in *Kingsley*. The first factor is the relationship between the need for the use of force and the amount of force used. *Kingsley*, 576 U.S. at 397. The third factor is whether the officer made any effort to temper or limit the force. *Id.*

Tournai spoke with Vita for about 30 seconds outside the fingerprint room, directing him to provide his identifying information to the fingerprint technician. Vita did not comply or agree to comply. Nor did he comply with directions after the incident became physical, despite responding "Okay" to the orders.

The videos show the Defendants' positioning and their difficulty gaining physical control over Vita while he was in the chair against the wall. These images show that Vita offered some physical resistance to the Defendants' directions to put his arms down and put his hand behind his back. This resistance continued after Vita was brought to a standing position. The video shows that despite two directives to get on the ground before the taser was used, Vita took several distinct steps away from the chair.

18

In the light of Vita's failure to comply with directions and his resistance to the Defendants, along with the fact that Vita was unrestrained in a large open area with other Sheriff's Office employees and unrestrained detainees, a reasonable officer on the scene would have found that tasering Vita to gain control of him was not objectively unreasonable. Indeed, courts have found that tasering a suspect or detainee who refuses to comply with directions is not excessive. *See Mann v. Taser Intern., Inc.*, 588 F.3d 1291, 1305-06 (11th Cir. 2009) (finding that tasering an arrestee did not constitute excessive force when she "actively resisted the deputies' efforts at effectuating a lawful arrest and refused to comply with their requests"); *Zivojinovich v. Barner*, 525 F.3d 1059, 1073 (11th Cir. 2008) (stating that the Eleventh Circuit has "previously held that in a difficult, tense and uncertain situation the use of a taser gun to subdue a suspect who has repeatedly ignored police instructions and continues to act belligerently toward police is not excessive force"); *Draper v. Reynolds*, 369 F.3d 1270, 1277-78 (11th Cir. 2004) (holding that a single use of a taser to gain control over a hostile, belligerent, and uncooperative suspect who refused to provide paperwork during a traffic stop was not excessive force).

While Vita clearly alleges that use of the taser was excessive, his complaint does not clarify whether the alleged excessive force includes other actions by Tournai. But

Vita alleges, and testified to, being slammed up against the wall. If Vita intends to allege that this action also constituted excessive force, he fails to show that it was excessive in violation of federal law. The videos show Vita being pushed toward the chairs and the wall behind the chairs. He made contact with the wall and the chairs and came to a seated position in one of the chairs, with the Defendants maintaining physical contact with him the entire time. Thus, the video contradicts Vita's allegation that he was "slammed" into the wall and then slid or "melted" down into the chair.

Vita does not show that this one push was objectively unreasonable under the circumstances, where he was unrestrained and had failed to comply with Tournai's directions. *See Robinson v. Lambert*, 753 F. App'x 777, 780 (11th Cir. 2018) (stating that the use of force in the form of pulling an inmate from his bunk and slamming him against the wall was warranted when a pretrial detainee repeatedly refused to obey commands to attend his first appearance).

Further, the amount of force that Tournai used was limited to one push and one taser deployment to gain control over Vita. The first and third *Kingsley* factors weigh toward finding that, from the viewpoint of a reasonable officer on the scene, the force used against Vita was not objectively unreasonable.

The second factor in assessing the reasonableness of force is the extent of the plaintiff's injury. *Kingsley*, 576 U.S. at 397. "[R]esulting injuries can be an indicator, however imperfect, of the severity of the force that caused them." *Patel v. Lanier Cnty. Ga.*, 969 F.3d 1173, 1184 (11th Cir. 2020). Vita was not physically harmed and brings his claims solely for emotional injury.

But the *Kingsley* decision did not "mean[] to suggest that unforeseeable injuries can transform a reasonable application of force into an excessive one." *Patel*, 969 F.3d at 1184. Vita's emotional injury reveals very little about whether the use of force was reasonable under the circumstances. Thus, although Vita suffered some injury, this second factor weighs toward finding that the force used was not excessive.

The fourth, fifth, and sixth *Kingsley* factors are considered together. The fourth factor is the severity of the security problem at issue. *Kingsley*, 576 U.S. at 397. The fifth factor is the threat reasonably perceived by the officer. *Id.* And the sixth factor is whether the plaintiff was actively resisting. *Id.*

Tournai was summoned for assistance because Vita was uncooperative with the fingerprint technicians. Vita, although calm while talking to Tournai, was noncompliant when Tournai asked him to provide his identifying information to the fingerprint technicians. As the situation developed, Vita, who from the video appears

to be as tall as or taller than the Defendants and was capable of offering some physical resistance to the Defendants, refused subsequent orders to release his arms, to put his hands behind his back, and to get on the ground.

The video evidence refutes Vita's allegation that he offered no physical resistance to the Defendants and that he complied with their directions. As stated in discussing the first *Kingsley* factor, the Defendants' obvious struggle to gain physical control over a seated individual's arms reflects some degree of physical resistance by Vita. The portion of the video after the Defendants stood Vita up makes especially apparent Vita's resistance and the Defendants' difficulty in subduing him. Instead of getting on the ground, Vita leaned and took several steps into the lobby area. The video evidence thus does not "render [Vita's] story merely unlikely." *Brooks*, 78 F.4th at 1278. Rather, reviewing "the facts in the light depicted by the videotape," *Scott*, 550 U.S. at 380-81, Vita's allegations that he offered no resistance are contradicted "completely and clearly," such that the Court need not defer to those allegations. *Brooks*, 78 F.4th at 1278.

Even viewing the facts in the light most favorable to Vita, the Court must account for Tournai's need to decide how to maintain order and to act quickly. *See Graham*, 490 U.S. at 396–97. As Tournai testified, less forceful means of trying to gain

22

control of Vita had been unsuccessful. And Tournai testified that an officer's inability to gain a subject's compliance creates a situation where force is used to avoid potential injury to anyone present, and that he was afraid any time a detainee was noncompliant. Again, Vita was unrestrained and this occurred in a large open area with other employees and unrestrained detainees nearby. Thus, a reasonable officer on the scene could have reasonably perceived a risk of this incident turning more physical or expanding to involve other inmates or Sheriff's Office employees.

Evidence about Vita's resistance, the security question at issue, and the threat reasonably perceived weighs toward finding that the force was not objectively unreasonable. *See, e.g.*, *Smith v. LePage*, 834 F.3d 1285, 1294 (11th Cir. 2016) ("[W]here a suspect appears hostile, belligerent, and uncooperative, use of a taser might be preferable to a physical struggle causing serious harm to the suspect or the officer."). Vita has failed to establish that Tournai violated federal law by using excessive force on him.

### b. The Law was not Clearly Established

Tournai argues that, even assuming the force was excessive, he is still entitled to qualified immunity. Tournai contends that any law finding unconstitutional the force used under the circumstances of this case was not clearly established.

23

"A right is clearly established when the state of the law g[ives] the [defendants] fair warning that their alleged conduct [is] unconstitutional." *Patel*, 969 F.3d at 1186 (internal quotation marks and citation omitted). In other words, a legal principle must be "settled" and "clear enough that every reasonable officer would interpret it to establish the particular rule the plaintiff seeks to apply." *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018).

Showing that a right is clearly established can be accomplished in several ways. First, "the plaintiff can point to a materially similar case decided at the time of the relevant conduct by the Supreme Court, the Eleventh Circuit, or the relevant state supreme court." *JW ex rel. Williams v. Birmingham Bd. of Educ.*, 904 F.3d 1248, 1259 (11th Cir. 2018). This method "looks at the relevant case law at the time of the alleged violation that would have made it obvious to the officer that his actions violated federal law." *Id.* Second, "the plaintiff can identify a broader, clearly established principle that should govern the novel facts of the situation." *Id.* And third, "the plaintiff can show that the conduct at issue so obviously violated the Constitution that prior case law is unnecessary." *Id.* at 1259-60.

Vita has not shown the clear establishment of an applicable rule through the second or third methods. As for the first method, Vita relies heavily on *Stryker v. City*

24

*of Homewood*, 978 F.3d 769 (11th Cir. 2020), to argue that clearly established law prohibited the force used here. But *Stryker* involves distinguishable facts and is not a "materially similar" case. In *Stryker*, a truck driver who was waiting in a parking lot pending an accident report alleged that when he turned and walked back to his truck, a police officer tasered him in the back without warning. *Id.* at 771-72. *Stryker* held that, under the version of events the plaintiff alleged, the force used was objectively unreasonable and stated that the Eleventh Circuit has "explicitly held—and thus clearly established—that employing a taser on a compliant, nonthreatening suspect violates the Constitution." *Id.* at 775.

But, as stated, the video evidence shows that Vita was not compliant. Thus, the law holding unconstitutional the use of force on compliant individuals did not apply here. Instead, clearly established legal precedent applicable to the factual circumstances that were quickly developing would have put Tournai on notice that it was reasonable to use force in the form of one push, and later one taser deployment, on an unrestrained inmate who was not complying with commands and who began resisting two officers. At a minimum, the law was not clearly established to prohibit that kind of force in this situation. Accordingly, because no genuine issue of material

fact exists regarding Vita's claim for excessive force, Tournai is entitled to qualified immunity.

## B. Failure to Intervene

### 1. Introduction

Vita sues Knotts for failure to intervene. An officer need not participate in the use of excessive force to be liable under § 1983. "[A]n officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force can be held personally liable for his nonfeasance." *Sears v. Roberts*, 922 F.3d 1199, 1205-06 (11th Cir. 2019) (quotation omitted); *Velazquez v. City of Hialeah*, 484 F.3d 1340, 1341 (11th Cir. 2007) (same). "[F]or an officer to be liable for failing to stop another officer's unconstitutional use of . . . force, the officer must be in a position to intervene." *Jackson v. Sauls*, 206 F.3d 1156, 1174 (11th Cir. 2000).

### 2. Discussion

Because Tournai did not use unconstitutionally excessive force, Knotts cannot be liable for failing to intervene in the use of such force. *See Sebastian v. Ortiz*, 918 F.3d 1301, 1312 (11th Cir. 2019) (stating that to be held liable for failure to intervene, "[o]f course, there also must be an underlying constitutional violation. Plainly, an

officer cannot be liable for failing to stop or intervene when there was no constitutional violation being committed" (citing *Crenshaw v. Lister*, 556 F.3d 1283, 1294 (11th Cir. 2009))).

Knotts argues that, even if the force was excessive, he is not liable for failure to intervene because he was not in a position to do so. The video supports Knotts's contention that the taser was deployed as he was occupied trying to control Vita and get him to the ground. Thus, even though Knotts testified that he was aware Tournai had unholstered his taser, Knotts was not in a position to intervene when the taser was used.

Finally, Knotts contends, even if he violated a federal law by failing to intervene, no clearly established law put him on notice that he was required to intervene in Tournai's use of force under the circumstances. Vita responds that Knotts recalled seeing Tournai drop his taser and would have known about well-established law finding unconstitutional the tasering of compliant detainees. But, as addressed, because Vita was not compliant and was resisting the officers, the clearly established law about the use of force on compliant individuals was inapplicable.

Vita has not shown that clearly established law would have put Knotts on notice that he had a duty to intervene under the circumstances. Knotts is therefore entitled

to qualified immunity on Vita's claim for failure to intervene. Because there is no genuine issue as to any material fact regarding Vita's claim for failure to intervene, Knotts is entitled to qualified immunity. Accordingly, the Court grants summary judgment to the Defendants.

The Court **ORDERS**:

1. Vita's motion to strike, (Doc. 47) is granted-in-part and denied-in-part as stated in this order.

2. The Defendants' Motion for Summary Judgment, (Doc. 44), is **GRANTED**.

3. The **CLERK** is directed to enter judgment in the Defendants' favor, to terminate any pending motions and deadlines, and to **CLOSE** this case.

**ORDERED** in Tampa, Florida, on June 30, 2025.

Kathryn Kimball Mizelle
United States District Judge

28